IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GABRIEL MORALES, § | | |
| TDCJ #499457, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | | CIVIL ACTION NO. G-05-0560 |
| § | | |
| BRIAN HORN, *et al.*, § | | |
| § | | |
| Defendants. § | | |

## **MEMORANDUM AND ORDER**

State inmate Gabriel Morales (TDCJ #499457) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights. He proceeds *pro se* and he has been granted leave to proceed *in forma pauperis*. The defendants have filed a joint motion for summary judgment. (Doc. # 46). Morales has filed a response. (Doc. # 47). After reviewing all of the pleadings, and the applicable law, the Court grants the defendants' motion and dismisses this case for reasons that follow.[1]

**I.    BACKGROUND**

Morales is currently in custody at the Montford Unit in Lubbock, Texas. The incident that forms the basis of Morales's complaint occurred at the Darrington Unit, where Morales was formerly assigned. Morales sues several TDCJ employees assigned to the Darrington Unit facility, including: Assistant Warden Brian Horn; Assistant Warden James W.

---

[1]   On October 25, 2007, this case was reassigned to United States District Judge Melinda Harmon pursuant to General Order 2007-10. The case is being handled by the undersigned by agreement of the judges.

Mossbarger; Major Joe Hicks; Captain Rory Knott; Captain William Dugger; Sergeant Laurence P. Ching; and Staff Psychologist Susan Balli, who is employed by the University of Texas Medical Branch ("UTMB") to provide mental health care services to state prisoners. Morales, a former gang-member, alleges that these defendants failed to protect him from harm in connection with an altercation that occurred at the Darrington Unit on or about January 11, 2004, when he was reportedly assaulted and stabbed by two active gang members. The undisputed facts about Morales's confirmed status as a member in the Mexican Mafia, his renunciation and disassociation from that affiliation, and the subsequent decisions about his custodial classification are described below.

Morales was convicted and sentenced to a thirty-year term of imprisonment in 1988, as the result of five separate counts of aggravated robbery with a deadly weapon.[2] In 1989, TDCJ officials confirmed that Morales was the member of the Mexican Mafia, which is a recognized security threat group ("STG").[3] (Doc. # 46, Exhibit B, at 2-3). Because of the threat to safety posed by these gang members, all inmates identified by TDCJ as members of an STG are housed in administrative segregation.[4] As a confirmed member of the

---

[2]  Those convictions are from Bexar County, Texas, in cause number 88-CR-3595. *See* Texas Department of Criminal Justice, Offender Information, available at: www.tdcj.state.tx.us (last visited October 26, 2008).

[3]  A "Security Threat Group" or STG is "[a]ny group of offenders which the TDCJ reasonably believes poses a threat to the physical safety of other offenders or staff due to the nature of said security threat group." (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 13).

[4]  Administrative Segregation is defined as a "non-punitive, maximum custodial status (continued...)

Mexican Mafia, Morales was housed in administrative segregation until 1998, when he disassociated from the gang and his status as an ex-member was confirmed, following an investigation by TDCJ Security Management Threat Group Office. (Doc. # 46, Exhibit B, at 1). As a result of the change in Morales's status, he was released from administrative segregation into the general population.

On February 22, 2002, Morales was involved in an altercation with four other Hispanic inmates while he was housed at the Ramsey II Unit. (Doc. # 46, Exhibit G). An investigation revealed that the altercation was minor and that the harm involved was minimal. (*Id.* at 2). Morales signed a waiver following the altercation, indicating that the situation was "resolved" and that he did not want protection or a transfer to another unit. (*Id.* at 3).

On June 5, 2003, the Ramsey II Unit Classification Committee ("UCC") recommended that Morales be transferred.[5] (Doc. # 46, Exhibit C, at 1). According to the

---

[4] (...continued)
involving separation of an offender from the general offender population for the purposes of maintaining safety, security, and order among general population offenders, correctional personnel, the public and within the prison institution." (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 5). Confirmed members of a security threat group or dangerous prison gang are among those inmates assigned to administrative segregation for security reasons, along with inmates who pose a current escape risk, a threat to the physical safety of other offenders or staff, the public, or a threat to the order an security of the institution as evidenced by repeated, serious disciplinary violations. (*Id.*).

[5] According to TDCJ policy, "[t]he Unit Classification Committee ("UCC") is responsible for making classification decisions or recommendations relative to an offender's needs at the unit level." (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 20). A UCC, which is composed of three voting members, reviews each offender's "custody designation, job assignment, housing assignment, and treatment programming" on a regular basis to ensure proper classification during his or her entire period of incarceration. (*Id.*). "Classification reviews may also be conducted as a result of changes in an offender's
(continued...)

UCC's records, the transfer was recommended because Morales had incurred four major disciplinary cases in a month, causing a demotion in his classification status to General Population Level Five, Line Class 3 (G5, L3).[6] (*Id.*). Because the Ramsey II Unit did not have appropriate housing for Morales's G5 custodial classification level, a unit transfer was required. (*Id.*). On June 13, 2003, the State Classification Committee ("SCC") approved the recommendation and authorized Morales's transfer to the Darrington Unit.[7] (*Id.* at 18).

Morales arrived at the Darrington Unit on June 17, 2003. The day after his arrival, Morales had a hearing before the Darrington UCC to determine his housing assignment.[8]

---

[5](...continued)
   security or treatment needs." (*Id.*).

[6] G5 is the lowest level of custodial classification, and the most restrictive placement, for offenders assigned to the general population. (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 82-83). G5 is reserved for offenders with one or more disciplinary conviction resulting in a major penalty, including those involving weapons, offender or staff assaults, extortion or sexual abuse, or a recent history of escape or attempted escape. (*Id.* at 82). By contrast, G1 or "General Population Level 1" is the least restrictive level. (*Id.* at 74-76). A G1 offender may be assigned to a cell, a dormitory, or to a trusty camp adjacent to the inmate's assigned unit. (*Id.* at 75).

[7] The State Classification Committee ("SCC") reviews each offender within thirty days of his arrival at TDCJ, unless exceptional circumstances intervene, and makes initial classification decisions based on the individual offender's needs. (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 18). In addition to selecting the initial unit or facility of assignment, the SCC is responsible for "reviewing and approving Institutional offenders for all inter-unit transfers, all assignments to Administrative Segregation and G1 custody and safekeeping status, emergency absences, all promotions in time-earning status, and decisions involving offenders in Administrative Segregation." (*Id.* at 20). The SCC is also "the final authority in the process of confirming offenders' security threat group affiliation, and the process of reviewing major unit disciplinary actions to ensure that the punishments imposed by Disciplinary Hearing Officers are within established limits and are equitable punishments for the offenses committed." (*Id.*).

[8] Upon an offender's arrival at a unit of assignment, the offender's recommended or
(continued...)

4

(Doc. # 46, Exhibit C, at 2). Assistant Warden Horn and Captain Knott were voting members of the UCC at that time. (*Id.*). Psychologist Susan Balli was also present at the hearing that day. She was not a voting member. Her role was limited to providing an assessment of any medical or mental health needs on Morales's part and to ensure that, if necessary, an appropriate treatment program was implemented.[9] During that hearing, the UCC assigned Morales to G5 custody and, because of his status as a former member of the Mexican Mafia, referred his file to the Darrington Unit STG office. (Doc. # 46, Exhibit C, at 2).

On October 3, 2003, Morales filed an I-60 official request form, addressed to an unspecified "appropriate security official." (Doc. # 46, Exhibit C, at 14-16). In that form, Morales, who was housed in the "E-Line" portion of the prison, claimed that his life was in danger because there were active members of the Mexican Mafia were housed in his building. (*Id.*). Morales explained that two unidentified inmates, who had been assigned to the Ramsey II Unit previously, had recognized him and had questioned him about his gang affiliation. (*Id.* at 15). These inmates reportedly knew of Morales's involvement in the

---

[8](...continued)
previously assigned custody designation is reviewed, and either confirmed or redesignated, by the UCC. (Doc. # 46, Exhibit F, TDCJ Classification Plan [Rev. Oct. 2003], at 20).

[9] According to Balli, Morales had a history of receiving mental health services for depression in 1999. (Doc. # 46, Exhibit A, Affidavit Susan Balli). Morales's depression was resolved that same year. (*Id.*). According to Balli, Morales reported having no current mental health needs and he did not request any services at the time of his transfer to the Darrington Unit in 2003. (*Id.*; *see also* Doc. # 46, Exhibit D, UTMB Mental Health Transfer Appraisal for Gabriel Morales, dated June 18, 2003).

5

altercation that occurred at the Ramsey II Unit in February of 2002, which supposedly involved other gang members. (*Id.*). Morales said that the inmates threatened to tell an active member of the Mexican Mafia, whose nickname was "Corpitos," that Morales was at the Darrington Unit. (*Id.* at 16). Morales complained that his status as an ex-member of the Mexican Mafia made him a target for active members of the Mexican Mafia and for all other active gang members as well. (*Id.*). Fearing for his safety, Morales asked to be "re-housed." (*Id.*).

Sergeant Ching, who was a gang investigator at the Darrington Unit, initiated an investigation of Morales's claim that his life was in danger. (Doc. # 46, Exhibit C, at 7-13). Sergeant Ching interviewed Morales and contacted another official (Captain Milsap) at the Ramsey II Unit to learn more about the altercation that Morales was involved in at that facility in February of 2002. (*Id.* at 11). Ching ultimately concluded that Morales's status as a former member of the Mexican Mafia could be "detrimental to his safety," but he was "unable to verify" any of Morales's claims of life endangerment. (*Id.* at 10).

On October 10, 2003, the Darrington UCC conducted a hearing on Morales's life endangerment claim. After considering Morales's claim and the investigation conducted by Sergeant Ching, Assistant Warden Horn and Captain Knott, as voting members of the UCC, recommended a unit transfer for Morales. (Doc. # 46, Exhibit C, at 10). The SCC disagreed. The SCC denied the Darrington UCC's recommendation, noting that the altercation involving Morales in February of 2002 occurred at the Ramsey II Unit, not the Darrington Unit, and was minor in nature. (*Id.* at 23). Likewise, the SCC noted that Sergeant Ching's

6

investigation failed to substantiate a threat to Morales's safety. (*Id.*). As a result of the SCC's decision, Morales remained at the Darrington Unit at the G5 classification level.

On December 11, 2003, the Darrington UCC, which included Assistant Warden Mossbarger, voted to promote Morales to level G4 custody and he was assigned to the "J-Line" area of the Darrington Unit. (Doc. # 46, Exhibit C, at 3). On January 11, 2004, Morales was assaulted by two other Hispanic inmates while another two prisoners served as lookouts. (Doc. # 46, Exhibit H, at 5). The assailants, who were also classified at the G4 level and housed on the J-Line, were suspected of being members of the Mexican Mafia, which means that prison officials believed they were members but had not been able to confirm their affiliation. (*Id.*). Morales suffered four stab wounds, three of which were to his chest. Morales also suffered injuries to his face. (*Id.* at 7-8, 12). As a result of his injuries, Morales was transported to UTMB Hospital in Galveston. (*Id.* at 7-8). Upon his arrival at the UTMB Hospital, Morales was placed in the intensive care unit and listed in stable condition. On January 12, 2004, Morales was released from intensive care, but he remained at the hospital in Galveston until January 23, 2004.

Captain Dugger investigated the assault. (Doc. # 46, Exhibit H, at 16-19). As part of the investigation, Captain Dugger interviewed Morales, who advised him that the inmates who attacked him on January 11, 2004, had attempted to confront him earlier that same day. (*Id.* at 17). Morales told Captain Dugger that he stood up to them and they seemed to back down. (*Id.*). Morales explained that he did not report the incident because he believed that everything was alright. (*Id.*).

After the assault occurred, the Chief of Classification at the Darrington Unit recommended that Morales not return to the Darrington facility. (Doc. # 46, Exhibit C, at 22). The SCC accepted that recommendation and approved a transfer to the Daniel Unit in Snyder, Texas, following Morales's release from the UTMB Hospital in Galveston. (*Id.* at 21).

In his civil rights complaint, Morales complains that the defendants failed to protect him from harm in violation of his Eighth Amendment rights. Specifically, Morales claims that the defendants were aware of his status as a former member of the Mexican Mafia, but failed to classify him appropriately in compliance with the TDCJ Classification Plan. Morales complains further that Sergeant Ching conducted an inadequate investigation of the October 2003 incident at the Darrington Unit. By failing to transfer him to another facility, or to classify him appropriately in light of his status as a former gang member, Morales maintains that the defendants were deliberately indifferent to his health and safety. Morales seek compensatory and punitive damages from all of the defendants for the injuries he suffered as a result of the January 11, 2004 assault. The defendants have filed a joint motion for summary judgment, arguing that Morales is not entitled to relief. The parties' contentions are addressed below under the governing standard of review.

## II.   STANDARD OF REVIEW

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"), which mandates the dismissal of a prisoner's civil rights complaint under the following circumstances. Upon initial screening of a prisoner civil rights complaint, the

PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). A reviewing court may dismiss a complaint for these same reasons "at any time" where a party proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief"). The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

The defendants have filed a motion for summary judgment, arguing that the plaintiff's claims fail as a matter of law. Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). In deciding a motion for summary judgment, the Court must determine whether the "pleadings, the discovery and disclosure materials on file, and any

9

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410,

412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted). Although the plaintiff proceeds *pro se*, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### III.    DISCUSSION

Invoking the Eleventh Amendment, the defendants assert that they are immune from Morales's claims for monetary damages in their official capacity. The defendants argue further that Morales cannot demonstrate a constitutional violation and that they are entitled to qualified immunity from suit in their personal or individual capacity. The defendants' arguments are addressed in turn.

#### A.    Immunity from Official Capacity Claims

All of the defendants are employed in one capacity or another by TDCJ or, in Susan Balli's case, by UTMB. Both TDCJ and UTMB are state agencies. As employees of the State of Texas, the defendants argue that the Eleventh Amendment to the United States Constitution bars any claim for monetary relief against them in their official capacity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed

to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Thus, federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002).

Unless expressly waived, the Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency. *See Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002). As instrumentalities of the state, UTMB and TDCJ are immune from a suit for money damages under the Eleventh Amendment. *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). It is also settled that the Eleventh Amendment bars a recovery of money damages under § 1983 from state employees in their official capacity. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).

In this case, Morales sues the defendants for actions taken during the course of their employment with the State of Texas. To the extent that Morales seeks monetary damages in this case, the Eleventh Amendment bars his claims against the defendants as state employees.[10] It follows that the defendants are entitled to immunity under the Eleventh

---

[10] A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or a state entity, where the relief sought is injunctive in nature and prospective in effect. *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123 (1980)). Morales does not seek injunctive relief in this (continued...)

Amendment from Morales's claims for money damages against them in their official capacity. Accordingly, the defendants are entitled to summary judgment on this issue.

### B.   Qualified Immunity for Individual Capacity Claims

The defendants argue that Morales has failed to establish a constitutional violation and that, even assuming that such a violation occurred, they are entitled to qualified immunity from his claims against them. Public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council – President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 456 (5th Cir. 2001)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, this Court must conduct a bifurcated analysis. *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004), *cert. denied*, 547 U.S. 1055 (2006). The threshold question has two parts. The initial inquiry asks whether, taken in the

---

[10](...continued)
   instance. Because he is no longer in custody at the Darrington Unit, where the defendants are assigned, any claim for injunctive relief has become moot. *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002); *see also Cooper v. Sheriff, Lubbock County, Tex*., 929 F.2d 1078, 1084 (5th Cir. 1991) (holding that an inmate's transfer from county jail to state prison rendered moot his claims for injunctive relief).

14

light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, — U.S. —, —, 127 S. Ct. 1769, 1774 (2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* (quoting *Saucier*, 533 U.S. at 201). If the defendant's actions violated a clearly established constitutional right, the final step of the analysis asks whether qualified immunity is appropriate, nevertheless, because the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537 (citations omitted).

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Id*. The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Id*.

In this instance, the defendants argue that Morales has failed to establish that their actions violated a clearly established constitutional right. They argue further that, even if a violation occurred, their actions were objectively reasonable under the circumstances. At the

15

summary judgment stage of this case, a determination whether a constitutional right was violated for purposes of the first prong of the qualified immunity analysis overlaps substantially with a determination whether Morales's claim lacks merit. Accordingly, the Court first addresses whether Morales has raised a genuine issue of material fact on whether the defendants failed to protect him from harm in violation of the Eighth Amendment.

### 1.     Eighth Amendment — Failure to Protect

To establish a failure-to-protect claim under 42 U.S.C. § 1983, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995). To act with deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Only deliberate indifference will suffice to state a failure-to-protect claim; mere negligence is not sufficient. *See id.*; *see also Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Morales complains that officials failed to protect him from the assault that occurred on January 11, 2004, because they failed to follow the TDCJ Classification Plan or consider his need for safety as a former gang member. The assault at issue in this case occurred after Morales's promotion to G4 classification status and his transfer from the E-Line to the J-Line on December 11, 2003. The record does not show that Morales received a threat from the

inmates who attacked him prior to the assault that occurred on January 11, 2004, or that Morales asserted a need for protection from these individuals before he was attacked.  Under these circumstances, Morales's general dissatisfaction with his custodial classification and his contention that the defendants failed to prevent the assault rises only to the level of mere negligence, if anything, and is not sufficient to state a failure-to-protect claim.  *See Farmer*, 511 U.S. at 837; *see also Neals*, 59 F.3d at 533 (concluding that allegations amounting to a claim of negligence in the failure-to-protect context did not raise a non-frivolous constitutional claim); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Likewise, the record does not demonstrate that officials failed to investigate the claim of life endangerment that Morales made on October 3, 2003, or that they deliberately ignored a substantial risk of serious harm.  As outlined above, Morales filed an I-60 official request in which he reported that another inmate recognized him from the Ramsey II Unit and threatened to alert an active member of the Mexican Mafia, identified as "Corpitos."  Sergeant Ching interviewed Morales and, as part of his investigation, he contacted an official at the Ramsey II Unit in an effort to learn more about the incident that occurred there.  The Darrington UCC held a hearing to consider Morales's claim of life endangerment.  Sergeant Ching recommended a unit transfer and so did the Darrington UCC, but the SCC denied the recommendation.

It appears that Morales faults Sergeant Ching for failing to substantiate his October 2003 claim of life endangerment.  Morales does not provide facts showing what more

17

Sergeant Ching could have done to substantiate the alleged threat to his safety. Likewise, he does not provide any facts showing that the threat allegedly made against him in October 2003, when Morales was assigned to G5 custody in another portion of the prison, was somehow linked to the assault that occurred on January 11, 2004, when Morales was assigned to G4 custody on the J-Line. Morales does not otherwise raise a genuine issue of material fact showing that the defendants failed to take reasonable steps to protect him from harm or that they acted with deliberate indifference to his safety. Under these circumstances, Morales fails to establish a constitutional violation of the Eighth Amendment.

### 2.     Objective Reasonableness

Because Morales has failed to establish a constitutional violation, the Court need not proceed to the final step of the qualified immunity analysis. *See Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007). Nevertheless, the defendants argue that, even if a violation occurred, they are entitled to qualified immunity from suit because they acted in good faith and their conduct was objectively reasonable under the circumstances. To avoid summary judgment on the defendants' qualified immunity defense, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (emphasis added). If reasonable public officials could differ as to whether the defendant's actions were lawful, the defendant is entitled to immunity. *See Malley*, 475 U.S. at 341 (1986). "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is

entitled to qualified immunity if the conduct was objectively reasonable." *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).

Where qualified immunity is asserted, Morales, as the plaintiff, has the burden to produce admissible evidence that raises a genuine issue of material fact on whether the defendants' actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them. *See Michalik*, 422 F.3d at 262. Morales does not meet that burden here. As outlined above, the summary judgment record reflects that, although Morales filed a claim of life endangerment in October of 2003, which was investigated, but not substantiated, Morales did not report any threat to his safety from the inmates who attacked him prior to the January 11, 2004 assault. Morales's allegation that the defendants failed to adequately investigate the threat that he first reported in October of 2003 does not raise a genuine issue of material fact on whether the actions taken with respect to his subsequent classification were unreasonable under the circumstances and is not sufficient to overcome the defendants' assertion of qualified immunity in this instance. The Court concludes, therefore, that summary judgment on the defendants' assertion of qualified immunity is warranted.

### C.    Remaining Defendants

In addition to the defendants who were served and who answered, Morales includes a claim against Arthur Velasquez, who was a Senior Warden at the Darrington Unit at the time the assault occurred. The Court did not request an answer from this defendant because

the pleadings do not allege sufficient facts showing that Senior Warden Velasquez, as a supervisory official, had the requisite personal involvement.[11]  Accordingly, Morales's claims against this individual fail for lack of personal involvement.  *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976)).  Morales does not otherwise establish a valid failure-to-protect claim under the Eighth Amendment or allege facts sufficient to overcome the defense of qualified immunity asserted by the other defendants in this case.  For these reasons, the claims against Warden Velasquez are dismissed for failure to state a claim upon which relief can be granted.

### IV.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motion for summary judgment (Doc. # 46) is **GRANTED**.

2. The complaint in this case is **DISMISSED** with prejudice.

The Clerk is directed to provide a copy of this order to the parties.

SIGNED on October 28th, 2008.

_____
Nancy F. Atlas
United States District Judge

---

[11]  The record reflects that Warden Velasquez's only involvement was that he participated in the investigation and review of the January 11, 2004 assault, about which a final report was presented to then-TDCJ Deputy Director of Prison/Jail Management Nathaniel Quarterman through Region III Director Margo Green.  (Doc. # 46, Exhibit H).